# In the United States Court of Federal Claims

No. 07-143 C
(Filed: March 21, 2013)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| SKANSKA USA BUILDING, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AND ORDER

Before the court are the parties' cross-motions for summary judgment and renewed cross-motions for summary judgment. In this action, plaintiff seeks to recoup the additional costs it incurred to dispose of certain excavated material upon the discovery of lead contamination in that material during contract performance. According to plaintiff, its costs to dispose of the lead-contaminated material were greater than the costs that it reasonably expected to incur at the time it submitted its bid. Defendant, on the other hand, contends that the costs to dispose of the lead-contaminated material were included in the total contract price. For the reasons set forth below, the court grants in part and denies in part both parties' motions for summary judgment.

## I. BACKGROUND

On March 31, 2003, the United States Army Corps of Engineers ("Corps") awarded contract number DACA67-03-C-0203, FY03 Whole Barracks Renewal, Fort Lewis, WA, to Skanska USA Building, Inc. ("Skanska").[1] App. 1-2. The contract concerned the construction of

---

[1] The court derives the facts in this section from the Declaration of Wes Johnson in Support of Plaintiff's Motion for Partial Summary Judgment on Liability ("Johnson Decl."); the exhibit attached to Mr. Johnson's declaration ("Johnson Ex."); the Declaration of Dave Berglund in Support of Plaintiff's Motion for Partial Summary Judgment on Liability ("Berglund Decl."); the Declaration of Terry R. Marston in Support of Plaintiff's Motion for Partial Summary Judgment on Liability ("Marston Decl."); the exhibits attached to Mr. Marston's declaration ("Marston Ex."); the appendix to Defendant's Motion for Summary Judgment ("App."); the exhibit attached to Defendant's Reply in Support of Its Motion for Partial Summary Judgment on Liability ("Def.'s Ex."); and the exhibit attached to the Supplemental Declaration of Terry R. Marston in Support of Plaintiff's Motion for Partial Summary Judgment on Liability ("Marston

nine buildings at North Fort Lewis.  Marston Ex. 11 at 4.  Skanska retained Nacon Inc. ("Nacon") to serve as a subcontractor to perform some of the work required by the contract.  Id. at 5.  Nacon, in turn, retained Active Construction, Inc. ("Active") to perform one of those areas of work–the earthwork.[2]  Id. at 7; Marston Ex. 12 at 4.  The earthwork generally consisted of the excavation, transportation, and placement of soil and other material.  See Marston Ex. 3 at 2, 4.

In preparing its proposal to perform the earthwork portion of the contract, Active's lead estimator, Dave Berglund,[3] reviewed both the contract documents and the reports from a site visit.  Berglund Decl. ¶ 8.  Mr. Berglund found that neither the contract documents nor the site visit reports indicated that the soil on the project site was contaminated.  Id. ¶¶ 9-11.  Further, Mr. Berglund's review of the contract documents led him to understand that "any soils that were not needed on the project would have to be disposed away from Ft. Lewis," id. ¶ 20, and that the contractor had the right to retain the salvage value of the surplus soil, id. ¶¶ 14-16.  Mr. Berglund ultimately estimated that Active would likely need to dispose of "several thousand" cubic yards of surplus soil.  Id. ¶ 21.  Although the cost of hauling and disposing that amount of surplus soil was normally high, id. ¶ 22, Mr. Berglund knew "that there was a market for clean fill material (soil) through which" Active could recover any hauling and disposal costs, id. ¶ 23.  Accordingly, because he believed the contract permitted Active to "retain any savings it could obtain in the course of disposing of any surplus soil [Active was] required to remove from the site," id. ¶ 22, he did not include any amounts for this expense in Active's proposal, id. ¶¶ 22, 24.

Through the course of the project, the contractors accumulated a stockpile of approximately 15,000 cubic yards of material.  See id. ¶ 25; Marston Ex. 1 at 1-2.  In Request for Information number 318 dated September 26, 2003, Skanska posed the following question to the Corps:

> Due to a surplus in satisfactory soils on the project, approximately 15,000 cubic yards, Active is requesting permission to place a portion of this material in the low area next to the revised location of the North irrigation vault per FY03 RFI #25. . . .  Active is also requesting that [it] be allowed to remove the remaining material from the project site.
>
> Please note that this work will be done at no cost to the Government.

---

Supp'l Ex.").

[2]  Active was a civil construction firm that had been doing business in the Fort Lewis region for forty-one years.  Berglund Decl. ¶ 4.

[3]  Mr. Berglund had seventeen years of experience working in civil construction in the Fort Lewis region.  Berglund Decl. ¶ 5.

Marston Ex. 1 at 1.  On October 1, 2003, Jim Packard, the Corps' project engineer,[4] Marston Ex. 4 at 1, responded: "Fort Lewis has no problem with us depositing surplus satisfactory soils in the low area . . . .  Coordinated with Larry Mc Vay of Public Works 1 Oct 03," Marston Ex. 1 at 1. Skanska followed-up Mr. Packard's response with Request for Information number 318R, which contained the same question and answer exchange as well as an additional inquiry:

> Post Note: In response to conversation between Jason Hynes and Doug Mc[N]iesh with Skanska and Jim Packard and Tom Wilkin with the [Corps] on 10/3/03,[5] Active has noted that approximately 5,000 cubic yards of soil will be spread near the North irrigation vault.  . . .  Active is requesting to remove 10,000 cubic yards of soil from the Post.  Please confirm that this is acceptable.

Id. at 2 (footnote added).  Mr. Packard provided the following response on October 7, 2003: "Post Note: Confirmed.  Regrade elevated area to grade to existing catch basin and/or add rings to adjust height of same.  Continue erosion control around catch basin."  Id.

In accordance with the Corps' apparent permission to dispose of the surplus soil off of Fort Lewis,[6] Active made arrangements with ESE Corporation on March 3, 2004, to haul away the soil at no cost to Active.  Berglund Decl. ¶ 25; Johnson Decl. ¶ 5; Johnson Ex.; App. 36. ESE Corporation planned to use the soil on its own project, but conditioned its agreement with Active on soil sampling certifying that the soil was not contaminated.  Johnson Decl. ¶¶ 4, 6; Johnson Ex.

---

[4] Mr. Packard described himself as the Corps' "voice to the contractor for day-to-day work," but as lacking the authority to "direct changes to the contract . . . ."  Marston Ex. 8 at 9. He further explained that the administrative contracting officer had the authority to issue change orders for work priced below $100,000 and that all other changes were within the authority of the contracting officer.  Id. at 10.

[5] Mr. Wilkin was the assistant project engineer.  See Marston Decl. ¶ 10.

[6] The court writes "apparent" because deposition testimony from November 2007 reflects some dispute within the Corps regarding the meaning of Mr. Packard's response to the amended request for information.  Compare Marston Ex. 7 at 6-7 (indicating the view of the contracting officer, Nancy Gary, that the Corps had authorized Active to remove the surplus soil from Fort Lewis), and Marston Ex. 9 at 4, 7-8 (indicating Mr. Wilkin's view that the Corps had confirmed the acceptability of Active removing the surplus soil from Fort Lewis), with App. 70-72 (indicating Mr. Packard's view that the requests for information merely reflected the Corps' written confirmation of prior oral agreements concerning the placement of some surplus soil near the irrigation vault).

Corps personnel performed soil sampling of the stockpile on March 23, 2004.[7]  App. 28.
The Corps' main objective in testing the soil was to ascertain the existence of lead
contamination.[8]  Id. at 27-30.  The Corps explained in its April 7, 2004 "Stockpile
Characterization Report" that the stockpile contained soil underlying World War II-era buildings,
painted with lead-based paint, that were demolished in the 1990s.  Id. at 26-27.  Because the
lead-based paint on those buildings had chipped and accumulated in the surrounding soil, the
Corps determined that it was necessary to test the soil for lead content to determine whether
reuse was possible or disposal was necessary.  Id. at 27-28; cf. Marston Ex. 7 at 11 (containing
Ms. Gary's acknowledgment that Skanska and its subcontractors were not responsible for the
existence of lead in the soil).  However, although the Corps decided to test the stockpile for lead
contamination, the contract contained no indication that the excavated soil might contain lead,
Marston Ex. 7 at 15; Marston Ex. 8 at 7, and Ms. Gary acknowledged that Skanska and its
subcontractors had no reason to suspect that the soil might contain lead, Marston Ex. 7 at 11; see
also Berglund Decl. ¶¶ 27-29 (noting that Active did not expect to encounter lead in the soil, that
lead contamination was "unusual" for the region, and that the contaminated soil "differed
materially from the soil[] conditions ordinarily encountered and generally recognized as inhering
in the work of the character [Active] performed in this contract").

Of the twenty-five soil samples collected and analyzed by the Corps, App. 27-28, only
one sample contained "total lead" that "exceed[ed] the decision criteria,"[9] id. at 29.  Because a
reanalysis of this sample "yielded a much lower result," the Corps inferred that "the soil [was]
not grossly contaminated with lead, but that paint chips [were] randomly mixed in with the soil."
Id.  The Corps concluded:

---

[7]  It is unclear from the record whether the soil sampling was performed at the request of
Skanska, Nacon, or Active, or whether the Corps tested the stockpile on its own initiative.

[8]  It appears that the stockpile contained more than the material excavated by Skanska and
its subcontractors.  According to Mr. Packard, the stockpile contained "a mixture of materials,"
including "unidentified materials" from work done on a prior contract, the material contaminated
by lead, and both satisfactory and unsatisfactory materials from work done on the instant
contract.  App. 76.  Thus, the Corps' decision to test the stockpiled material for the presence of
lead may have been due to the existence of material in the stockpile that was not placed there by
Skanska or its subcontractors.  If this is the case, it is unclear to the court why the Corps did not
test the material in the stockpile either prior to awarding the contract to Skanska or prior to
allowing Active to place additional material on the stockpile.

[9]  The "decision criteria" consisted of two standards.  App. 29.  One standard, derived
from the Washington Model Toxics Control Act, was titled "MTCA Method A Cleanup Criteria
for Unrestricted Use," which required soil samples to contain no more than 250 mg/kg total lead.
Id.  The second standard was titled "WA Dangerous Waste TCLP Limits," which limited TCLP
lead in soil samples to no more than 5 mg/L.  Id.  The acronym "TCLP" was not defined in the
excerpts of the report provided to the court.

> [T]he stockpiled soil is mostly free of lead contamination, but does contain some total lead concentrations exceeding Washington State MTCA Method A Unrestricted Use criteria. . . . However, the soil does not appear to be a "dangerous waste" according to [Washington Administrative Code] 173-303 and does not need to be handled as such.

Id. at 30. Based upon its conclusion, the Corps made the following recommendations:

> In light of both the near and far term goals, the best use of this stockpile is to keep it on base for reuse or disposal. The soil could be kept on base at Fort Lewis under restricted use. . . .
>
> It would be beneficial to both the contractor currently in charge of the stockpile and Fort Lewis to find other projects for which this soil could be reused. One possible reuse project is for building up and fortifying worn berms within active ranges. . . .
>
> Another possible reuse project would be to use the stockpiled soil for filling in around new construction footings and foundations. By keeping the soil on base, transportation costs are significantly reduced, disposal costs are eliminated, and the cost to purchase fill material is eliminated.
>
> If the soil is to be disposed, two options are available–disposal on base or disposal off base. Again, it would be beneficial to both the contractor currently in charge of the stockpile and Fort Lewis to dispose the soil on base. By disposing the soil at the Fort Lewis landfill, transportation costs are reduced and disposal costs are significantly reduced. The Fort Lewis landfill is currently trying to close its cell #6 at Landfill 5. They need soil to bring the fill to grade . . . .
>
> If it is decided that off-site disposal will be used, most Subtitle D facilities will be able to accept this waste.[10]

Id. (footnote added); cf. Marston Ex. 7 at 12 (containing Ms. Gary's confirmation that plaintiff was unable to sell the lead-contaminated soil). Mr. Packard hand-delivered a copy of the report to Skanska on April 9, 2004. Marston Ex. 4 at 1.

---

[10] "Subtitle D" is a reference to the portion of the Resource Conservation and Recovery Act of 1976, Pub. L. No. 94-580, § 2, 90 Stat. 2795, 2813-20, that added subtitle D to the Solid Waste Disposal Act, Pub. L. No. 89-272, title II, 79 Stat. 992, 997-1001 (1965) (codified as amended at 42 U.S.C. §§ 6941-6949a (2006)). See Marston Supp'l Ex. 14 (indicating that "subtitle D" referred to the "RCRA"). The "Subtitle D" facility nearest to Fort Lewis was located approximately thirty-one miles away in Graham, Washington. App. 79.

Among the various Corps and Army personnel receiving a copy of the report on the day it was issued was Phil Crawford, the Chief of the Environmental Compliance Branch of the Environmental Division of the Fort Lewis Public Works.  App. 31, 33; Marston Supp'l Ex. 2. On April 12, 2004, Mr. Crawford directed Mike Roberts, a contractor in the Environmental Division whose expertise was lead-based paint, to head the effort to find a use for the stockpile. App. 31, Marston Supp'l Ex. 6.  Subsequently, consideration was given to using the soil to enhance a berm on one of the ranges on Fort Lewis.  App. 33-34.  Carl Ramsey, a United States Army employee in charge of the ranges, rejected the use of the soil for this purpose out of fear that the lead would leach into the groundwater.  Id. at 34; Marston Supp'l Ex. 6.  In response to Mr. Ramsey's concerns, Mr. Crawford wrote:

> This soil is minimally contaminated with traces of lead in paint chip form.  It is, for all intents and purposes, clean fill.  It is below all regulatory levels, and easily passes the TCLP leaching test.  It poses no threat to groundwater.  I can see no environmental reason not to use it in enhancing berms; it's going to be a lot cleaner than anything else around it.  I can foresee no situation in which this soil could cause a range to be shut down.  The lead from bullets plowing into it will be a far greater source than the few paint chips left in this stuff.  I cannot think of a better place to use it than as a range berm; sounds like a win-win to me.

App. 33; see also Marston Supp'l Ex. 4 (containing Mr. Crawford's explanation that "clean fill" can be "anything that falls below . . . regulatory limits, and, therefore, has no restrictions on its use").

Subsequently, in an April 16, 2004 letter to Skanska regarding the "Stockpile Characterization Report," the administrative contracting officer for the contract, Troy D. Collins, P.E., wrote:

> As you can see, the report indicates that, while this material is not hazardous, the lead content exceeds the limit for reuse and must be disposed of in a Class 'D' landfill if disposed of off Post.[11]  It can be used on site in locations where it would be encapsulated such as under footings, pavement or grass/vegetation.

Marston Ex. 4 at 1 (footnote added).  Some time after Skanska received the report and the letter from Mr. Collins, Active began to research the costs of transporting the surplus soil to a Class D landfill.  Marston Ex. 13 at 8, 12.

Active also communicated with Nacon regarding the disposal of the surplus soil.  In a June 29, 2004 letter, Robert A. Matthews, Active's project manager, indicated that Active had been "informed that the surplus Soil was contaminated, and that the Soil had to be utilized on-

---

[11]  According to Mr. Crawford, "a class D landfill is just a regular sanitary landfill.  That's subtitle D of the RCRA."  Marston Supp'l Ex. 14.

site or hauled to a class D disposal site." Marston Ex. 6 at 1; see also Marston Ex. 13 at 8 (containing Mr. Matthews's deposition testimony that the Corps informed him that the soil had to be "placed in a Class D landfill" because "the contaminant level was higher than the tolerance allowed for placing it as general fill where the public can . . . have access to it"). Active had been using the "contaminated" surplus material from its grading operations "to meet all finished grade elevations," but had determined that the stockpiled material was not necessary for that use. Marston Ex. 6 at 1. Accordingly, Active sought "direction for the disposal of the contaminated surplus soil," contending that such disposal was "outside of [its] scope of work . . . ." Id.

It appears that in August 2004, the Corps informed Active that it could dispose of the surplus soil at Landfill #2 at the Fort Lewis Logistics Center, which was nine miles away from the project site. See App. 36, 74-75. As a result, on August 17, 2004, Skanska submitted, on behalf of Nacon and Active, a written request for compensation in the amount of $204,533 for the "additional costs" the contractors would "incur to remove approximately 15,000 cubic yards of contaminated soil from the project site." Id. at 36. As outlined by Skanska's project executive, Stewart M. Grauer, the Corps initially notified Skanska that the surplus material "would need to be used on Fort Lewis[] or transported to a Class 'D' Landfill for disposal." Id. Mr. Packard subsequently informed Skanska that the surplus "soil could be used at Fort Lewis Landfill #2." Id. Mr. Grauer indicated that Skanska, Nacon, and Active would "proceed with this work immediately when Landfill #2 [was] ready for the material in approximately a week['s] time to avoid schedule impacts to the FY04 project." Id. But, because the surplus material could "no longer be classified as clean suitable material useful for pre-load at ESE's project," the contractors believed that "compensation for loading and hauling this material off site to dispose of it at Landfill #2" was warranted.[12] Id.

The Corps denied Skanska's request for compensation in an August 26, 2004 letter. Id. at 37. In that letter, Theodore S. Lewis, the contracting officer's representative, confirmed that the surplus material was "of no use to the Government" and noted that the contract accordingly required Skanska to dispose of the material off of government-controlled land at no additional cost to the Corps. Id. However, although he "authorized" Skanska to dispose of the surplus material off of government-controlled land, Mr. Lewis explained that the government was offering Skanska an alternative:

> Because of its mild lead content, the dumping of it would of necessity need to
> meet all environmental regulations, and the Government would have to be notified
> of its proper disposal. The Government is offering to allow the material to be

---

[12] There is evidence in the record suggesting that plaintiff submitted a change order request seeking compensation for the disposal of the surplus material at a Class D landfill (and not Landfill #2). See Marston Ex. 7 at 12; Marston Ex. 8 at 5-6, 8. But see App. 75 (noting that Mr. Packard was not aware of a cost estimate for hauling the material to a Class D landfill).

disposed of in Fort Lewis landfill #2 to mitigate any potential costs of disposal
outside of Government-controlled land.

Id.

The next day, Doug McNiesh of Skanska sent an electronic-mail message to Mr. Packard
indicating Active's decision "to discontinue hauling efforts" until the compensation issue could
be resolved.  Id. at 39.  Mr. Packard forwarded the message to Arill Berg, P.E., the administrative
contracting officer,[13] who responded to Mr. McNiesh in an August 27, 2004 electronic-mail
message, as follows:

> I understand that you have mobilized equipment to dispose of excess excavated
> soil from your project site and are disposing of it at the Fort Lewis Logistics
> Center.  In my opinion, this direction by the Government alters the terms of the
> contract to mitigate future risk.  You are directed to complete the relocation of this
> material to mitigate any potential demobilization and remobilization costs.  At this
> point, we are operating on the assumption that this is either a credit or no cost to
> the Government.

Id. at 40.  The Corps expanded upon this communication with a September 8, 2004 letter, in
which the contracting officer's representative, George P. Henry, P.E., confirmed that Skanska
was disposing of the surplus soil at the Fort Lewis Logistics Center and formally directed
Skanska "to complete the relocation of this material to mitigate any potential demobilization and
remobilization costs."  Marston Ex. 5 at 1.  Mr. Henry also reiterated that the Corps was
"operating on the assumption that this is either a credit or no cost to the Government."  Id.

Despite this directive from the Corps, Skanska and its subcontractors discontinued their
relocation of the surplus material to the Fort Lewis Logistics Center.  App. 42.  In a September
21, 2004 letter, Mr. Henry chastised Skanska for refusing to comply with the directive in his
earlier letter and Mr. Berg's electronic-mail message:

> You have taken this action, although you were made aware of their interference
> with the FY04 Barracks project.
>
> If you choose not to move these materials to the Log[istics] Center site
> which has been provided for your convenience prior to October 30, 2004, then
> you may relocate them off the unauthorized FY04 Barracks site and back on to
> your FY03 Barracks Site, and then remove them from the FY03 site at a later date
> which will not impact the completion of your contract.

---

[13]  Mr. Collins had been the administrative contracting officer in April 2004.  Marston Ex.
4 at 1.  The record does not indicate when Mr. Berg assumed this position.

You are directed to remove these materials from the FY04 Barracks site no later than October 30, 2004.

Id. Skanska and its subcontractors resumed moving the surplus soil to Landfill #2 on October 19, 2004. See id. at 43. In a November 5, 2004 letter to Nacon, later revised on December 29, 2004, Mr. Matthews described Active's costs for moving the surplus soil to Landfill #2, which totaled $123,272.68. Marston Ex. 14 at 1-2.

Ultimately, on December 5, 2005, Skanska submitted a certified claim to the contracting officer seeking "compensation for costs associated with encountering contaminated soils" on the project site in the amount of $148,498. Def.'s Ex. 1. The contracting officer granted in part and denied in part Skanska's claim on May 4, 2006. Id. Skanska timely filed the instant complaint for breach of contract. The court denied the parties' original cross-motions for summary judgment. However, believing that the case presented no genuine issues of material fact, the parties renewed their motions. After reviewing the parties' original summary judgment briefing and the briefs in support of their renewed motions for summary judgment, the court vacated its earlier ruling. This decision supersedes the court's earlier ruling.

## II.  LEGAL STANDARD FOR SUMMARY JUDGMENT

The parties have both moved for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The moving party may discharge its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The moving party is not required to support its application with affidavits, but instead may rely solely on the pleadings, depositions, answers to interrogatories, and admissions. Id. at 324. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. Id. The nonmoving party must go beyond the pleadings and support its opposition with affidavits or with depositions, answers to interrogatories, and admissions. Id. The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When ruling on a motion for summary judgment, the court must not weigh the evidence or make findings of fact. See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial."); <u>Contessa Food Prods., Inc. v. Conagra, Inc.</u>, 282 F.3d 1370 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), <u>abrogated on other grounds by</u> <u>Egyptian Goddess, Inc. v. Swish, Inc.</u>, 543 F.3d 665 (Fed. Cir. 2008) (en banc); <u>Ford Motor Co. v. United States</u>, 157 F.3d 849, 854 (1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); <u>Mansfield v. United States</u>, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter.  Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues.").  Entry of summary judgment is mandated, "after adequate time for discovery," against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp.</u>, 477 U.S. at 322.  However, if neither party meets this burden on the filing of cross-motions for summary judgment, then the court must deny both motions.  <u>See, e.g.</u>, <u>Canal 66 P'ship v. United States</u>, 87 Fed. Cl. 722, 723 (2009); <u>Dick Pac./GHEMM, JV v. United States</u>, 87 Fed. Cl. 113, 126 (2009).

## III.  DISCUSSION

Plaintiff contends that the then-newly discovered lead in the stockpiled soil constituted a differing site condition and that defendant's refusal to compensate it for the disposal of the surplus soil constitutes a breach of contract.  Compl.  ¶¶ 46, 50, 52-53.  The dispute in this case is predicated on the interpretation of several contract provisions, taken both individually and as a whole, as well as the determination of which contract provisions were relied upon by the parties during contract performance.

### A.  Contract Interpretation

"Contract interpretation is a question of law generally amenable to summary judgment." <u>Varilease Tech. Group, Inc. v. United States</u>, 289 F.3d 795, 798 (Fed. Cir. 2002).  In interpreting a contract, the court begins by examining its language.  <u>TEG-Paradigm Envtl., Inc. v. United States</u>, 465 F.3d 1329, 1338 (Fed. Cir. 2006).  The court considers the contract as a whole and interprets it "so as to harmonize and give reasonable meaning to all of its parts."  <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."  <u>Id.</u>  "When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions."  <u>TEG-Paradigm Envtl., Inc.</u>, 465 F.3d at 1338.

### B.  Section 02300, "Earthwork"

The parties cite provisions from three sections of the contract: (1) section 01410, "Environmental Protection," App. 3-5; (2) section 01572, "Construction and Demolition Waste Management," Marston Ex. 2 at 1-3; and (3) section 02300, "Earthwork," Marston Ex. 3 at 1-8.

The court turns first to section 02300, which addresses the topic directly at issue in this case: earthwork.

To begin, the "General Excavation" requirements are described in section 02300, as follows:

> The Contractor shall perform excavation of every type of material encountered within the limits of the project to the lines, grades, and elevations indicated and as specified. . . . . Satisfactory excavated materials shall be transported to and placed in fill or embankment within the limits of the work. . . . Surplus satisfactory excavated material not required for fill or embankment shall be disposed of outside the limits of Government-controlled land.  Unsatisfactory excavated material shall be disposed of outside the limits of Government-controlled land.

Id.  Then, in the same section, the "Utilization of Excavated Materials" is addressed, as follows:

> Unsatisfactory materials removed from excavations shall be disposed of outside the limits of Government-controlled land.  Satisfactory material removed from excavations shall be used, insofar as practicable, in the construction of fills, embankments, subgrades, shoulders, bedding (as backfill), and for similar purposes.  No satisfactory excavated material shall be wasted without specific written authorization.  Satisfactory material authorized to be wasted shall be disposed of outside the limits of Government-controlled land.

Id.  Section 02300 also contains definitions for "satisfactory materials" and "unsatisfactory materials," as follows:

1.4.1 Satisfactory Materials

> Satisfactory materials shall comprise of any materials classified by ASTM 2487 as GW, GP, SW, and SP.[14]  Materials classified by ASTM D 2487 as GP-GM and SP-SM are satisfactory provided they contain moisture contents suitable for the intended use.[15]  Black organic-rich gravel (GM) is satisfactory only for open, seeded, turfed, or other landscaped areas provided they contain moisture

---

[14] "ASTM D 2487" refers to a publication of the American Society for Testing and Materials titled "Classification of Soils for Engineering Purposes (Unified Soil Classification System)."  Marston Ex. 3 at 1.  According to this publication, these four classifications describe well-graded gravel, poorly graded gravel, well-graded sand, and poorly graded sand.  App. 12-13.

[15] These two classifications describe, respectively, poorly graded gravel with silt and poorly graded sand with silt.  App. 13.

contents suitable for the intended use. . . .

1.4.2 Unsatisfactory Materials

Materials which do not comply with the requirements for satisfactory materials are unsatisfactory. Unsatisfactory materials also include man-made fills; trash; refuse; backfills from previous construction; and material classified as satisfactory which contains root and other organic matter or frozen material. The Contracting Officer shall be notified of any contaminated material.

Id. at 2 (footnotes added). Notably, neither definition indicated whether it encompassed contaminated material.

According to these provisions, the contractor was required to excavate all material necessary to achieve the specified lines, grades, and elevations in the project. Id. at 4. The excavated material would fall into one of two mutually exclusive categories: (1) satisfactory material, which included well-graded gravel, poorly graded gravel, well-graded sand, poorly graded sand, some poorly graded gravel with silt, some poorly graded sand with silt, and some black organic-rich gravel and (2) unsatisfactory material, which included all material that was not satisfactory. Id. at 2, 4. The contractor was instructed to place satisfactory excavated material "in fill or embankment within the limits of the work." Id. at 4; see also id. ("Satisfactory material removed from excavations shall be used, insofar as practicable, in the construction of fills, embankments, subgrades, shoulders, bedding (as backfill), and for similar purposes."). If the contractor had surplus satisfactory excavated material, it was required to dispose of it, along with all unsatisfactory excavated material, "outside the limits of Government-controlled land." Id. Prior to disposing of surplus satisfactory material, however, the contractor was required to obtain "specific written authorization." Id. Thus, looking at section 02300 in isolation, Skanska and its subcontractors could assume that they were required to bear the responsibility for and cost of transporting and disposing of surplus satisfactory excavated material and all unsatisfactory excavated material off of Fort Lewis.[16]

## C. Section 01572, "Construction and Demolition Waste Management"

Of course, neither party contends that section 02300 should be considered in isolation. Plaintiff argues that the provisions of section 01572, which concerns construction and demolition waste management, relate directly to its transportation and disposal costs for surplus satisfactory material. Pl.'s Mot. Partial Summ. J. Liability ("Pl.'s Mot.") 13-14. At the outset of section 01572, the "Government Policy" concerning waste management is recited: "Government policy

---

[16] There is nothing in the record before the court to suggest that at the time of contract performance, the Corps characterized the surplus stockpiled material as unsatisfactory material. Accordingly, the court proceeds on the assumption that all of the stockpiled material was satisfactory material.

is to apply sound environmental principles in the design, construction and use of facilities.  As part of the implementation of that policy[,] the Contractor shall . . . divert construction and demolition waste from landfills and incinerators and . . . facilitate their recycling or reuse." Marston Ex. 2 at 1.  Implementation of this policy is described in the "Management" provision:

> The Contractor shall take a pro-active, responsible role in the management of construction and demolition waste and require all subcontractors, vendors, and suppliers to participate in the effort.  Construction and demolition waste includes products of demolition or removal, excess or unusable construction materials, packaging materials for construction products, and other materials generated during the construction process but not incorporated into the work.  In the management of waste[,] consideration shall be given to the availability of viable markets, the condition of the material, the ability to provide the material in suitable condition and in a quantity acceptable to available markets, and time constraints imposed by internal project completion mandates.  . . .  Revenues or other savings obtained for salvage[] or recycling shall accrue to the Contractor.[17] Firms and facilities used for recycling, reuse, and disposal shall be appropriately permitted for the intended use to the extent required by federal, state, and local regulations.

Id. (footnote added).  Plaintiff contends that the language of this provision applies to the soil classified as surplus satisfactory material pursuant to section 02300.  Pl.'s Mot. 13.  In further support of this contention, plaintiff cites two other provisions contained in section 01572.  One provision, titled "Mandatory Materials for Collection," states: "The collection and segregation of certain waste materials is mandatory.  These materials shall include: soils, organic materials (clean green), concrete, asphalt, masonry, metals, aluminum, glass, paper, cardboard, recyclable plastics, gypsum board, [and] clean dimensional lumber."  Marston Ex. 2 at 3 (emphasis added). The other provision, titled "Project Waste Management Requirement," states: "The contractor shall salvage or recycle at least 50 percent (by weight) of the generated construction, demolition and land clearing waste."  Id. (emphasis added).  According to plaintiff, these two provisions reinforce its assertion that section 01572 in general, and the "Management" provision

---

[17]   Defendant contends that the underlining of this sentence in the contract is "nothing more than an editing mark."  Def.'s Mot. Summ. J. ("Def.'s Mot.") 15 n.2; Def.'s Reply Supp. Its Mot. Partial Summ. J. Liability ("Def.'s Reply") 5.  The court cannot draw the same conclusion based upon the contract excerpts submitted by the parties.  See Marston Exs. 2-3; App. 3-10; Supp'l Br. Issue "Clean Fill Materials" ("Pl.'s Supp'l Mem. Ex.") 1-3.  In these excerpts, deleted text is stricken, see App. 3, and added text is underlined, see id. at 3-5; Pl.'s Supp'l Mem. Ex. 1. In addition, all of the altered text is clearly designated by a vertical line in the right margin.  See App. 3-5; Pl.'s Supp'l Mem. Ex. 1.  Such a vertical line is not present to the right of any part of the "Management" provision.  See App. 6; Marston Ex. 2 at 1.  Thus, the court presumes that the underlining present in that provision constituted intentional emphasis.  The court invited defendant to rebut this presumption in its October 8, 2008 order, but defendant failed to do so.

specifically, applies to soil.  Pl.'s Mot. 13.

Defendant rejects any suggestion that section 01572 applies to soil.  Def.'s Mot. 12-14. At the outset, defendant focuses on the express language of the "Management" provision, noting that the provision concerns only "construction and demolition waste."  Id. at 13.  Defendant argues that because soil is not included in the list of items constituting "construction and demolition waste" and because "it . . . cannot reasonably be said that earth that existed on the site long before any demolition and removal efforts on this project ever took place[] can ever be a 'product' of those demolition and removal efforts, much less 'generated by the construction process,'" the "Management" provision "has nothing to do with soil."  Id.  Defendant then addresses the other provisions of section 01572 cited by plaintiff, arguing first that the "Mandatory Materials for Collection" provision "merely provides that soil should be segregated from other materials, has nothing to do with any purported 'right to revenue' . . . , and, if anything, demonstrates that[] when provisions of the contract pertain to soil, soil is specifically identified as the subject of that provision."  Id. at 14.  Second, with respect to the "Project Waste Management Requirement" provision, defendant contends that "[t]he idea that 'land clearing waste,' i.e., materials that are cleared off the land, are the same thing as the land itself is absurd on its face."  Id. at 13.

Defendant's interpretation of the "Management" provision of section 01572 cannot stand. The provision clearly states that "[c]onstruction and demolition waste includes products of demolition or removal, excess or unusable construction materials, packaging materials for construction products, and other materials generated during the construction process but not incorporated into the work."  Marston Ex. 2 at 1.  Although the term "material" is not defined in section 01572, elsewhere in the contract, including in the "Earthwork" section, "material" is defined so as to specifically include soil.  See Marston Ex. 3 at 2.  Based on the contract's language, it seems logical that surplus excavated soil is a "material[] generated during the construction process but not incorporated into the work."  The surplus soil would not have existed but for the excavation activities.  Moreover, the "Mandatory Materials for Collection" provision clearly includes soil within the definition of "waste materials."  Indeed, if the court adopted defendant's interpretation of this provision, it would lead to the illogical conclusion that none of the other items mentioned along with soil– "organic materials (clean green), concrete, asphalt, masonry, metals, aluminum, glass, paper, cardboard, recyclable plastics, gypsum board, [and] clean dimensional lumber"–could be considered "construction and demolition waste" because none of those items was listed in the "Management" provision.

Having established that soil is within the ambit of section 01572, the court must determine the import of the penultimate sentence of the "Management" provision: "Revenues or other savings obtained for salvage[] or recycling shall accrue to the Contractor."  Plaintiff contends that "[t]he clause assigns to the contractor the financial benefit (whether in savings or profit) of disposing of unneeded materials generated in the course of the construction project." Pl.'s Mot. 13.  Plaintiff explains that by incorporating the clause into the contract, the government is "harnessing the ingenuity of its contractors for its own financial benefit by

encouraging them to find the most economical way to recycle, salvage, or dispose of construction byproducts," and, as such, is "gain[ing] the assurance that bidders will be forced to reduce their bid prices by the savings they expect to accrue through salvage, or risk being underbid for the work should they fail to [do so]." Id. Thus, according to plaintiff, "it had the right to retain any savings accrued through the disposal of surplus soils." Id. Although defendant rejects plaintiff's interpretation of the clause,[18] its position that the clause "does nothing more than entitle the contractor to keep the proceeds of its recycling and salvage efforts (as opposed to turning them over to the Government), if those efforts are successful," Def.'s Mot. 14-15, is, in actuality, similar to plaintiff's position. Thus, the court agrees with both parties. Through the "Management" provision of section 01572, the Corps assigned the contractor the "[r]evenues or other savings obtained for salvage[] or recycling" to the extent that the contractor was able to realize such revenues or savings. Consequently, the contractor could benefit from this provision by gauging its potential salvage and recycling revenues and savings and incorporating those revenues and savings in its bid. As plaintiff notes, though, if the contractor did not adjust its bid price to reflect its expected savings, it bore the risk of losing the contract to a lower-priced bidder. Accordingly, looking at section 01572 in conjunction with section 02300, the court concludes that plaintiff was entitled to lower its bid price by the amount it reasonably believed it could receive through the sale of surplus satisfactory material.

### D. Section 01040, "Environmental Protection"

One other contract section must be considered: section 01410, which concerns environmental protection. Defendant contends that the provision titled "Clean Fill Materials" in section 01410 precluded plaintiff from removing any soil from Fort Lewis that the Corps deemed to be "clean fill." Id. at 11. The "Clean Fill Materials" provision appears under the heading "Disposal of Solid Waste," as follows:

3.5.2 Clean Fill Materials

Clean fill materials shall be disposed of on Fort Lewis at a site as directed by

_____

[18] The primary source of the parties' disagreement concerns plaintiff's contention that it has "the right to any compensation obtained for the value of materials removed . . . ." Pl.'s Mot. 13. Defendant interprets plaintiff's contention as providing that "in the event that there is no available market for a particular item of construction or demolition waste, or if the contractor cannot resell the waste for the amount that it hoped, the contractor can then turn to the Government to be paid for 'lost' salvage value, whether measured in terms of transportation costs or otherwise." Def.'s Mot. 15. Defendant misconstrues plaintiff's argument. Had plaintiff advanced such a contract interpretation, the court would have rejected it as overly broad. In sum, if plaintiff wrongfully assumed that there was a market for a particular waste item (as that item appeared at the time that the Corps was soliciting bids) or if plaintiff erroneously estimated the salvage value of a waste item, it would not be able to recoup the difference in cost from the government.

> [Public Works], Engineering & Contract Management Division.  Clean fill shall
> not contain any items such as vegetative material, asphalt, concrete or metals.

App. 5.  The term "[c]lean fill materials" is not affirmatively defined in the contract; it is defined
only by what clean fill does not contain.  However, the parties expand on this loose formulation
by citing other provisions of section 01410.

> Defendant, on one hand, contends that clean fill is, "'technically, anything that falls
> below . . . regulatory limits, and therefore, has no restrictions on its use.'"  Def.'s Resp. Pl.'s
> Supplemental Briefing Dep. Philip Crawford ("Def.'s Dep. Br.") 3 (quoting the deposition of Mr.
> Crawford); accord Def.'s Supplemental Mem. ("Def.'s Supp'l Mem.") 2.  Defendant further
> explains:

> > [T]he term "clean fill" is of necessity a catchall category whose precise definition
> > depends first and foremost upon excess soil's suitability for beneficial use outside
> > of the immediate limits of a construction site . . . , and, as a secondary matter,
> > upon state and Federal regulatory definitions of what materials necessitate special
> > use or disposal considerations.

Def.'s Supp'l Mem. 2; accord id. at 6.  According to defendant, this definition is "informed by
reference" to the definitions of "hazardous material" and "hazardous waste" contained in the
same section.  Id. at 2-3.  Those two terms are defined as follows:

> > a. Hazardous material (HM): A useful product that requires special management
> > because it has hazardous characteristics (ignitability, corrosivity, reactivity, or
> > toxicity) that could pose dangers to human health or the environment.  A[n] HM
> > becomes a Hazardous Waste when it can no longer be used for its intended
> > purpose.

> > b. Hazardous waste (HW): A discarded material with properties that could pose
> > dangers to human health or the environment.  A[n] HW either exhibits a
> > hazardous characteristic (ignitability, corrosivity, reactivity, or toxicity) or is
> > specifically listed as a[n] HW by the EPA or by the State.

App. 3.  Defendant argues that "[t]he term 'clean fill materials' is defined broadly, encompassing
all materials other than those soils containing a handful of prescribed categories of excluded
characteristics, because the contractual focus is–and must be–upon what can be reused consistent
with applicable environmental regulatory requirements."  Def.'s Supp'l Mem. 3; see also Def.'s
Resp. Pl.'s Supplemental Mem. ("Def.'s Supp'l Resp.") 5 ("[C]lean fill is, as a matter of that
contract, quire broad, encompassing any material that does not fit within the contractual
definitions of 'hazardous material' or 'hazardous waste.'").

> On the other hand, plaintiff defines "clean fill materials" simply as "material that is not

contaminated by a hazardous substance."[19]  Supplemental Br. Issue "Clean Fill Materials" ("Pl.'s Supp'l Mem.") 1; accord Pl.'s Resp. Def.'s Supplemental Mem. ("Pl.'s Supp'l Resp.") (contending that clean fill is "uncontaminated fill material").  Plaintiff asserts that its definition is supported by two provisions from the "General Requirements" portion of section 01410.  The first, untitled, provision describes the contractor's responsibilities with respect to environmental protection:

> The contractor shall perform the work minimizing environmental pollution and damage as the result of construction operations under this contract.  For the purpose of this specification, environmental pollution and damage is defined as the presence of chemical, physical, or biological elements or agents which adversely affect human health or welfare; unfavorably alter ecological balances of importance to human life; affect other species of importance to humankind; or degrade the utility of the environment for aesthetic, cultural, and/or historical purposes.

Pl.'s Supp'l Mem. Ex. 1.  The second provision, titled "Laws and Regulations," states: "The Contractor shall comply with all applicable Federal, State, and Local environmental, natural and cultural resources, and historic preservation laws and regulations.  . . .  These specifications supplement these laws and regulations."  Id. at 2-3.  Plaintiff also contends that the Washington Model Toxics Control Act regulations, which define "'cleanup level'" as "'the concentration of hazardous substance in soil, water, air, or sediment that is determined to be protective of human health and the environment under specified exposure conditions,'" support its proffered definition.  Pl.'s Supp'l Mem. 2 (quoting Wash. Admin. Code 173-340-700 (2007)).

Ultimately, despite the parties' reliance on different contractual provisions, the court does not find significant difference between the parties' definitions of "clean fill materials."  On the one hand, defendant contends that clean fill "encompass[es] any material that does not fit within the contractual definitions of 'hazardous material' or 'hazardous waste,'" Def.'s Supp'l Resp. 5, while on the other hand, plaintiff asserts that clean fill is "material that is not contaminated by a hazardous substance," Pl.'s Supp'l Mem. 1.  Thus, the court concludes that clean fill consists of fill that neither contains nor constitutes "hazardous material" or "hazardous waste" and does "not contain any items such as vegetative material, asphalt, concrete or metals."

Although the parties do not have a significant dispute concerning the contract's definition of "clean fill materials," they are at odds over whether the surplus material at issue in this case

---

[19]  In its reply brief, plaintiff advances the additional contention that lead-contaminated soil cannot be included within the definition of "clean fill materials" due to the exclusion of "metals" from the definition.  Pl.'s Reply Supp. Mot. Summ. J. Liability & Opp'n Def.'s Cross-Mot. Summ. J. ("Pl.'s Reply") 6-7.  Given that "metals" are listed as "items" along with "vegetative material, asphalt, [and] concrete," it is likely that "metals" refers to scrap metal and not elemental metal.

fits within that definition. As an initial matter, the parties appear to agree that the Corps, and not plaintiff, was responsible for determining whether particular material constituted clean fill. See Def.'s Supp'l Mem. 2, 4-5 (citing the deposition testimony of Mr. Berglund and Mr. Matthews of Active and Mr. Hynes of Skanska for the proposition that the "contract . . . vested in the Government sole discretion to determine what constituted 'clean fill materials'"). However, contrary to defendant's contentions that the Corps had the "sole discretion to determine in the first instance what constituted clean fill that was clean enough for use by the Government," Def.'s Dep. Br. 4, and that "[t]he determination of whether excess soils from the project site were clean enough to fulfill the Government's needs . . . is one that is solely for the government to make," id. at 5, any discretion that the Corps had to designate material in the stockpile as clean fill is limited by the section's exclusion of "hazardous material" and "hazardous waste" from the material that can constitute clean fill. In other words, the Corps was not entitled to declare material to be clean fill if that material contained or constituted "hazardous material" or "hazardous waste."

Defendant contends that the Corps properly designated the surplus satisfactory material in the stockpile as clean fill for two reasons. First, defendant asserts that the material was neither "hazardous material" nor "hazardous waste" because "the soils were put to deliberate and beneficial reuse at Landfill No. 2 . . . ." Def.'s Supp'l Mem. 3. Specifically, defendant contends that the material was not "hazardous material" because it was used for its intended purpose and that the material was not "hazardous waste" because it had not been discarded. Defendant misinterprets the definitions of "hazardous material" and "hazardous waste." A "hazardous material" is a "useful product that requires special management because it has hazardous characteristics . . . that could pose dangers to human health and the environment." App. 3. Thus, contrary to defendant's assertion, using a hazardous material for its intended purpose does not transform it into nonhazardous material. Similarly, while a "hazardous waste" is a "discarded material with properties that could pose dangers to human health or the environment," id., retaining a hazardous material does not render the material nonhazardous. The key inquiry is not whether the material was used or discarded, it is whether the material has "hazardous characteristics" or "is specifically listed as a [hazardous waste]" by the federal or state governments.

The second reason advanced by defendant to support the Corps' designation of the surplus material in the stockpile as clean fill addresses this more relevant inquiry. Defendant contends that the lead content of the soil "fell below state and Federal regulatory action limits," thus excluding it from the definition of "hazardous waste." Def.'s Supp'l Mem. 4. Plaintiff disagrees, arguing that because the Corps reported "some total lead concentrations exceeding Washington State MTCA Method A Unrestricted Use criteria," App. 30, the soil was "hazardous waste," Pl.'s Supp'l Resp. 3-5. Plaintiff further asserts that, contrary to the "Stockpile Characterization Report," the soil was a "dangerous waste" pursuant to the Washington law. Id. at 2-3 (citing Wash. Rev. Code § 70.105.010 (2008) ("'Dangerous wastes' means any discarded, useless, unwanted, or abandoned substances, . . . which are disposed of in such quantity or concentration as to pose a substantial present or potential hazard to human health, wildlife, or the

environment because such wastes or constituents or combinations of such wastes . . . [h]ave short-lived, toxic properties that may cause death, injury, or illness . . . .")).  And, plaintiff avers, because the soil is a "dangerous waste," it is also a "hazardous waste."  Id. (citing Wash. Rev. Code § 70.105.010 ("'Hazardous waste' means and includes all dangerous and extremely hazardous waste . . . .")).  As evidence that the Corps considered the soil to be a "dangerous waste," plaintiff again cites the "Stockpile Characterization Report," which included the Corps' suggestion that off-site disposal would need to be done at a "Subtitle D" facility.  Id. at 3-4 (citing App. 30).

Plaintiff's reliance on Washington law is not well-founded.  Certainly, one way in which the material could qualify as "hazardous waste" pursuant to the contract was if the material was "specifically listed" as a "hazardous waste" by the state.  See App. 5.  And, under Washington law, "hazardous waste" is synonymous with "dangerous waste."  See Wash. Rev. Code § 70.105.010 (defining "hazardous waste" as "all dangerous and extremely hazardous waste" and defining "extremely hazardous waste" as a subset of  "dangerous waste").  However, the "Stockpile Characterization Report" indicated that while some lead concentrations exceeded the relevant state criteria, the soil did not "appear to be a 'dangerous waste'" pursuant to the applicable state law.  Presumably, the Corps believed that lead concentrations did not "pose a substantial present or potential hazard to human health, wildlife, or the environment," as required by the Washington statute.  See App. 5.  Plaintiff's only evidence that the soil was a "dangerous waste"–the report's reference to a "Subtitle D" facility, i.e., a Class D landfill–is unconvincing.  The plain language of the Resource Conservation and Recovery Act of 1976 demonstrates that a "Subtitle D" facility is one that handles regular solid waste, while a "Subtitle C" facility would be one that handles hazardous waste.  Compare 90 Stat. at 2814 (codified at 42 U.S.C. § 6943) ("The plan shall . . . contain requirements that all solid waste ( . . . not including hazardous waste) shall be . . . disposed of in sanitary landfills . . . or otherwise disposed of in an environmentally sound manner."), with id. at 2807 (codified at 42 U.S.C. § 6924) ("[T]he Administrator shall promulgate regulations establishing such performance standards, applicable to owners and operators of facilities for the treatment, storage, or disposal of hazardous waste identified or listed under this subtitle, as may be necessary to protect human health and the environment. ").  The plain language of the statute is reinforced by the deposition testimony of Mr. Crawford.  See Marston Supp'l Ex. 14 ("[A] Class D landfill is just a regular sanitary landfill.").  But see Marston Ex. 13 at 8 (containing the implication by Mr. Matthews that a Class D landfill could accept contaminated soil that was not considered to be "general fill").  Altogether, the surplus material at issue in this case was not a "hazardous waste" by virtue of being listed as such by the state of Washington.  However, this conclusion does not end the court's inquiry.

As noted above, section 01410 provides that a "hazardous waste" is either listed as such by the state or federal government or "exhibits a hazardous characteristic" that "could pose dangers to human health or the environment," App. 5, which implies that state or federal standards are not necessarily controlling.  The parties do not directly address this portion of the "hazardous waste" definition and the court finds conflicting evidence in the record on whether

the soil posed any danger.  On the one hand, the Corps informed plaintiff and its subcontractors that the soil was contaminated and could not be used as general fill material.  <u>See</u> Marston Ex. 4 at 1; Marston Ex. 6 at 1; App. 36-37.  On the other hand, because, according to Mr. Crawford, the soil was "for all intents and purposes, clean fill,"[20] App. 33, the Corps determined that the soil could be used in various locations for various purposes on Fort Lewis, <u>id.</u> at 30, 33; Marston Ex. 4 at 1; Marston Ex. 6 at 1, and ultimately directed plaintiff to transport it to Landfill #2 on Fort Lewis, App. 36, 74-75.  In other words, the Corps claimed that the surplus material was not hazardous while at the same time restricting the use of the material.  The issue that has not been addressed to the court's satisfaction is whether, by restricting the use of the surplus material in the stockpile, the Corps was, in effect, conceding that the material could pose a health or environmental danger.[21]  Thus, the court finds that there is a genuine issue of material fact with respect to whether the surplus material in the stockpile contained or constituted "hazardous waste," and, therefore, whether the Corps properly classified the material as clean fill.

The presence of this genuine issue of material fact does not end matters, however.  As the court has interpreted the individual provisions of the contract thus far, sections 02300 and 01410 of the contract appear to contain conflicting directives for the disposal of excavated material.  Consider the following illustration:

> The contractor, during the course of constructing a building on a military base, excavated a large amount of soil and other material.  In compliance with the contract, the contractor used the satisfactory material on the project site to construct fills, embankments, subgrades, shoulders, and bedding.  However, after the contractor had completed its construction of all of the fills, embankments,

------

[20] It bears noting that there is no evidence in the record that the Corps, during plaintiff's performance of the contract, actually invoked section 01410 and informed plaintiff that it had designated the surplus material in the stockpile as clean fill.  <u>See</u> App. 37 (informing plaintiff that it was required to dispose of the material off of Fort Lewis pursuant to section 02300, but that the Corps was offering a less expensive alternative to mitigate the costs of disposal), 40 (informing plaintiff that the Corps' direction to plaintiff to dispose of the material at Landfill #2 "alter[ed] the terms of the contract to mitigate future risk"); <u>see also</u> Def.'s Reply 1-2 ("[B]ased upon <u>contractual provisions not relied upon by the contract administrator at the time that it directed Skanska to transport project soils to Landfill #2</u>, but relied upon by the contracting officer in her decision on Skanska's claim, . . . the Government was . . . empowered . . . to direct Skanska to transport project soils to Landfill #2 . . . ." (emphasis added)).  The failure of the Corps to invoke section 01410 at the time of contract performance is addressed below.

[21] Moreover, the definition of "clean fill materials" also excludes "hazardous material[s]," which, like "hazardous waste," have "hazardous characteristics . . . that could pose dangers to human health or the environment."  App. 5.  Neither party addressed whether the surplus material in the stockpile could constitute a "hazardous material" pursuant to this definition.

subgrades, shoulders, and bedding on the project site, some satisfactory
excavated material remained unused.  In compliance with the contract, the
contractor explored the possibility of disposing this surplus material off of the
base, sought the necessary permission for disposal from the government, and
received (it believed) the government's permission.  However, the government
subsequently directed the contractor to place the same surplus material that,
pursuant to the contract, could only be used on the project site or off of the base
altogether, on other parts of the base, purportedly pursuant to another provision
of the contract.

In the above illustration, which generally describes the case at bar, the contract contains two
apparently conflicting provisions concerning the disposal of the surplus material in the stockpile.
The court addresses the apparent conflict between section 02300 and section 01410 below.

## E.  Reconciling Section 02300 and Section 01410

Based upon the definitions and descriptions contained in sections 02300 and 01410, it is
apparent that material could be classified as both satisfactory material and clean fill.  The parties
agree with this proposition.  Def.'s Mot. 20-21, 23; Def.'s Reply 13; Def.'s Supp'l Mem. 6; Pl.'s
Supp'l Mem. 2-3; Def.'s Supp'l Resp. 6.  Indeed, defendant contends that the material excavated
by plaintiff and its subcontractors actually constituted both clean fill and satisfactory material.[22]
Def.'s Mot. 20-21; Def.'s Reply 13; Def.'s Supp'l Mem. 7.  However, the contract provides
different disposal requirements for clean fill and satisfactory material.  Section 01410 clearly
requires the contractor to dispose of "clean fill materials" on any part of Fort Lewis identified by
Fort Lewis officials.[23]  But, as the court has interpreted section 02300, satisfactory excavated
material must either be used at the project site or away from Fort Lewis altogether.  In other
words, if satisfactory excavated material is deemed to be both surplus to the work on the project

_____

[22]  It appears that defendant's contention is based, in part, on its belief that the "General
Excavation" provision in section 02300 permitted the government to direct the disposal of
satisfactory material on any part of Fort Lewis and not just on the project site.  See Def.'s Reply
12.  As noted above, the court disagrees with this interpretation.  Plaintiff was allowed to dispose
of satisfactory material pursuant to section 02300 in only two locations: on the project site or
away from Fort Lewis.

[23]  Plaintiff contends that there is no evidence that an official from the "[Public Works],
Engineering & Contract Management Division" directed the disposal of the excavated material at
Landfill #2, as was required by the contract.  Supplemental Briefing Following Crawford Dep. 4-
5.  To the extent that the government directed plaintiff to dispose of the surplus material at
Landfill #2 pursuant to section 01410–a proposition examined and rejected by the court
below–plaintiff's contention lacks merit.  Had Fort Lewis officials not wanted the excavated
material to be placed at Landfill #2, they would have raised the relevant objections or the
disposal would not have occurred.

site and clean fill, the contract demands two mutually exclusive disposal locations: on Fort Lewis and off of Fort Lewis.

As a general rule, the court must attempt to "give[] meaning to all parts of the contract" without rendering any part of the contract meaningless. NVT Techs., Inc., 370 F.3d at 1159. The court can give meaning to both section 01410 and section 02300 if one of the sections is subordinate to the other. Defendant's position is that section 01410 trumps section 02300. Specifically, defendant asserts that "'clean fill' may be comprised of either satisfactory materials or some types of unsatisfactory materials" and that the "the question of whether the Government has a reuse for its own property is one that must of necessity be addressed before there is a determination of what, if any, materials must be hauled off Government-controlled land as surplus or excess satisfactory materials, or as unsatisfactory materials." Def.'s Supp'l Mem. 6; accord id. at 7-8; Def.'s Mot. 20; Def.'s Supp'l Resp. 6, 8. Plaintiff suggests the opposite position, contending that section 01410 can be interpreted as being "subject to" section 02300 if the requirement that "[c]lean fill materials shall be disposed of on Fort Lewis" is read as requiring "clean fill materials" to be disposed of on the project site.[24] Pl.'s Supp'l Mem. 4; Pl.'s Supp'l Resp. 5. Plaintiff's interpretation is untenable because it would rewrite the express terms of section 01410. On the other hand, defendant's position–that the government was entitled to reuse the material excavated from its land as it saw fit–is reasonable. Section 01410 allowed the government to determine whether any of the excavated material could be used elsewhere on Fort Lewis, and if it could not be so used, the Corps could permit the disposal of the excavated material off of Fort Lewis pursuant to section 02300. Indeed, plaintiff was not allowed to remove any satisfactory excavated material from Fort Lewis until it had received written permission from the Corps, strongly suggesting that the Corps had expansive control over the ultimate disposition of the material.[25] Accordingly, the court finds that section 02300 should be read as being subject to section 01410. Once again, however, this finding does not end the court's inquiry. While section 01410 takes precedence over section 02300 as the contract is written, such precedence has been rendered meaningless here by the Corps' actions.

## F. The Corps' Failure to Invoke Section 01410

---

[24] Plaintiff also argues that there is "no evidence that the Plaintiff either actually knew (or should have known) . . . of the presence within § 01410, the Environmental Protection section of the contract, of a term addressing disposition of soils in addition to those found, as is the normal practice, in § 02300 Earthwork." Pl.'s Supp'l Resp. 6. This argument is facially absurd. "Both parties to a contract are charged with knowledge of its terms. Neither the contractor nor the government can avoid its legal responsibilities by asserting ignorance." Maxima Corp. v. United States, 847 F.2d 1549, 1556 (Fed. Cir. 1988).

[25] As noted above, while the Corps' control was expansive, it was not exhaustive. The Corps could only direct the disposal of excavated material on those parts of Fort Lewis outside of the immediate project site if the material did not contain or constitute "hazardous waste" or "hazardous material."

As noted above, the Corps did not, as required by the contract, invoke section 01410 when directing plaintiff to dispose of the excavated material in the stockpile at Landfill #2. See supra note 20. Defendant concedes that fact. See Def.'s Reply 1-2. The evidence in this case plainly shows that Mr. Lewis, the contracting officer's representative, informed plaintiff on August 26, 2004, that the surplus material was "of no use to the Government" and that plaintiff was required to dispose of the material off of Fort Lewis pursuant to section 02300, but that the Corps was offering a less expensive alternative to mitigate the costs of disposal. App. 37. And, on August 27, 2004, Mr. Berg, the administrative contracting officer, informed plaintiff that the Corps' direction to plaintiff to dispose of the material at Landfill #2 "alter[ed] the terms on the contract to mitigate future risk." Id. at 40. None of these communications mentioned section 01410. In fact, not one representative of the Corps informed plaintiff that the Corps considered the surplus excavated material to be clean fill; the only use of this term at the time of contract performance was in an April 15, 2004 electronic-mail message sent by Mr. Crawford to Corps and Fort Lewis personnel, and even then, Mr. Crawford merely indicated that the material was, "for all intents and purposes," clean fill, without actually declaring it to be clean fill. See App. 33. Indeed, even after plaintiff objected to disposing of the excavated material at Landfill #2 without additional compensation, the Corps chose not to invoke section 01410. Thus, it is clear that even though section 01410 was available to the Corps as a means to direct the disposal of the surplus excavated material, the Corps relied solely on section 02300 when it directed the disposal.

Because the Corps relied solely on section 02300, the proper interpretation and application of section 01410, particularly the question of whether the surplus material in the stockpile was properly classified as clean fill, is rendered irrelevant by the Corps' conduct. Consequently, the court's task is limited to addressing whether plaintiff complied with section 02300; whether the discovery of lead in the surplus material in the stockpile constituted a differing site condition; and whether the Corps' directive to plaintiff to dispose of the surplus material in the stockpile at Landfill #2 constituted a constructive change to the terms of the contract.

### G. Plaintiff's Compliance With Section 02300

Pursuant to section 02300, plaintiff was required to obtain "specific written authorization" prior to disposing satisfactory excavated material "outside the limits of Government-controlled land." Marston Ex. 3 at 4. On September 26, 2003, plaintiff requested permission to dispose of the surplus material in the stockpile in Request for Information number 318. Marston Ex. 1 at 1. When the Corps, via Mr. Packard, neglected to address this request, plaintiff reiterated it in Request for Information number 318R, specifying that it would like to "remove 10,000 cubic yards of soil from the Post" and requesting that the Corps "confirm that this is acceptable." Id. at 2. Mr. Packard responded to the amended request for information on October 7, 2003, writing: "[c]onfirmed." Id.

Understandably, plaintiff interpreted Mr. Packard's response as the "specific written authorization" required by section 02300, and proceeded to make arrangements to dispose of the surplus material at no cost to itself or the Corps.  See Berglund Decl. ¶ 25; Johnson Decl. ¶¶ 4-6; Johnson Ex.; App. 36; Pl.'s Mot. 12; Pl.'s Reply 14.  Defendant contests plaintiff's interpretation, arguing that "[t]here is a genuine issue of material fact as to whether such authorization was, in fact, given in the first instance, given the facial ambiguity of the RFI responses and the testimony of James Packard . . . ." Def.'s Mot. 21 n.6.  Defendant is mistaken. Mr. Packard's response to the amended request for information is not ambiguous and Mr. Packard's testimony, provided more than four years after he supplied his response, is not credible on this topic, especially given the contrary testimony from the contracting officer and the assistant project engineer.  Conceding that it might be incorrect, defendant then asserts that even if the Corps had granted plaintiff permission to remove the surplus material from Fort Lewis, the Corps was not prevented from "retracting or changing its determination." Id.; accord Def.'s Reply 13-14.  The accuracy of defendant's assertion is immaterial, because later statements by the Corps indicate that it never revoked permission to dispose of the material off of Fort Lewis. For example, Mr. Lewis informed plaintiff on August 26, 2004, that the surplus material was "of no use to the Government" and "authorized" plaintiff to dispose of the material off of Fort Lewis. App. 37.  Thus, the Corps did not retract or change its written authorization.  In sum, plaintiff satisfied the prerequisites to off-site disposal set forth in section 02300.

## H.  Differing Site Condition

Having established that plaintiff obtained the necessary written authorization pursuant to section 02300 to dispose of the surplus satisfactory material off of Fort Lewis, the court's next task is to determine whether the discovery of lead contamination in the material after plaintiff had received the written authorization constitutes a differing site condition.  The parties indicate that the contract contained the following clause:

52.236-2  Differing Site Conditions.

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of–

(1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or

(2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice.  If the conditions do materially so differ and cause an

increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in paragraph (a) of this clause for giving written notice may be extended by the Contracting Officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

Federal Acquisition Regulation ("FAR") 52.236-2, cited in Pl.'s Mot. 7-8; Def.'s Mot. 23.  Here, plaintiff alleges a "Type II" differing site condition pursuant to FAR 52.236-2(a)(2).

"[T]o qualify as a [Type II differing site] condition, the unknown physical condition must be one that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience if any, as a contractor in the area." Perini Corp. v. United States, 381 F.2d 403, 410 (Ct. Cl. 1967), quoted in Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1276 (Fed. Cir. 2001).  "The purpose of the Differing Site Conditions clause is to allow contractors to submit more accurate bids by eliminating the need for contractors to inflate their bids to account for contingencies that may not occur." H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1343 (Fed. Cir. 1998); accord Foster Constr. C.A. v. United States, 435 F.2d 873, 887 (Ct. Cl. 1970).  The clause limits a contractor's responsibility to consider, prior to bidding on a contract, contingencies such as "latent or subsurface conditions, for which the Government has assumed responsibility," and, as a result, does not endow bidders with an expansive duty to investigate the site. Foster Constr. C.A., 435 F.2d at 887; accord Servidone Constr. Corp. v. United States, 19 Cl. Ct. 346, 356 (1990), aff'd, 931 F.2d 860 (Fed. Cir. 1991).  However, a contractor seeking to establish a Type II differing site condition "is confronted with a relatively heavy burden of proof" because "the Government has elected not to presurvey and represent the subsurface conditions with the result that a claimant must demonstrate that he has encountered something materially different from the 'known' and the 'usual.'" Charles T. Parker Constr. Co. v. United States, 433 F.2d 771, 778 (Ct. Cl. 1970).

Plaintiff contends that it has established all three elements of a Type II differing site condition: a physical condition that is (1) unknown, (2) unusual, and (3) materially different from what is ordinarily encountered in similar work.  Pl.'s Mot. 10.  First, plaintiff avers that it was unaware of the lead contamination in the excavated material in the stockpile until the Corps discovered the contamination during contract performance.  Id.; see also Proposed Findings Uncontroverted Fact ("Pl.'s Facts") ¶¶ 7-10 (citing deposition testimony from Mr. Packard, Ms. Gary, Mr. Matthews, and Mr. Berglund).  Second, citing the declaration of Mr. Berglund,

plaintiff avers that "it is unusual for soils encountered in the course of earthwork to be contaminated with lead." Pl.'s Mot. 10.  Third, plaintiff contends that "[t]he presence of lead contamination was material because contamination of this type necessitates that the soils be disposed of in restricted landfills for this purpose," and, unlike the clean soil that it expected, "lead contaminated soils ha[ve] no market value . . . ." Id.; see also Pl.'s Reply 5-6 (citing the "Stockpile Characterization Report," Mr. Lewis's letter to plaintiff, and the declarations of Mr. Johnson and Mr. Berglund); Pl.'s Facts ¶ 11 (citing the declaration of Mr. Berglund).

Defendant responds that the Differing Site Conditions clause is inapplicable, analogizing the facts of this case to those in Martin Paving Co., ASBCA No. 48279, 97-2 BCA ¶ 29,085, aff'd, 173 F.3d 433 (Fed. Cir. 1998) (unpublished table decision).[26]  See Def.'s Resp. Pl.'s Renewed Cross-Mot. Partial Summ. J. Liability & Def.'s Cross-Mot. for Partial Summ. J. on Liability 5-9.  The contract in that case concerned the resurfacing of a runway at Patrick Air Force Base.  The runway had not been resurfaced for several years.  Instead, cracks that developed had been filled with joint sealant material.  The contractor was required to mill the runway and then overlay the runway with hot mix asphalt.  The contract specified that the milled material was "to be hauled off base and [was] not the property of or responsibility of the Government."

When preparing its bid, but without performing a site inspection, the contractor decided to reduce its costs by reusing the milled material in its hot asphalt mix; the standard specification incorporated in the contract permitted the use of recycled asphalt and no other contract provision prohibited the use of recycled asphalt.  The contractor did not inform the government of its intent to reuse the milled material in its hot asphalt mix until the preconstruction conference, when it requested permission to take core samples of the runway to determine the suitability of the material for reuse.  Because the runway was still in use, the government permitted the contractor to take core samples only from the shoulder of the runway.  The samples taken by the contractor included some taken over sealed cracks.  Testing did not reveal anything unusual about the asphalt.  The government ultimately approved the contractor's asphalt mix design, which included thirty-five percent recycled asphalt from the material milled from the runway.

---

[26]  While the decisions of the boards of contract appeals are not binding on the United States Court of Federal Claims, the analyses contained in those decisions may be instructive.  See Gen. Elec. Co., Aerospace Grp. v. United States, 929 F.2d 679, 682 (Fed. Cir. 1991) (stating that the decision of a board of contract appeals that was "confronted with the same issue" was not binding on the United States Court of Federal Claims).  Similarly, unpublished decisions of the United States Court of Appeals for the Federal Circuit ("Federal Circuit") do not constitute binding precedent, but they may contain persuasive reasoning.  See Fed. Cir. R. 32.1(d) ("The court may refer to a nonprecedential disposition in an opinion or order and may look to a nonprecedential disposition for guidance or persuasive reasoning, but will not give one of its own nonprecedential dispositions the effect of binding precedent.").

Soon after beginning the resurfacing of the runway, unacceptable foreign material began to appear on the asphalt's surface.  With the government's approval, the contractor stopped the resurfacing and created a new hot asphalt mix using a new source of recycled asphalt.  Upon investigation, the contractor discovered that the source of the unacceptable foreign material was a coal-tar-based joint sealant material.  Coal-tar-based materials are not compatible with asphalt and therefore are used only by mistake or when there is a need for a fuel-resistant material.  Indeed, federal and industry standards require the use of an asphalt-based joint sealant material on asphalt pavement.  In preparing its bid and assessing whether to reuse the milled material in its hot asphalt mix, the contractor had relied on its assumption that the government would have complied with these standards.

Because of the unexpected presence of coal-tar-based joint sealant material on the runway–a condition that could not have been discovered during a site inspection or through the limited core sampling permitted by the government–the contractor filed a claim for the additional costs it incurred in resurfacing the runway with a new hot asphalt mix.  The contracting officer denied the claim, and both the Armed Services Board of Contract Appeals ("board") and the Federal Circuit affirmed that decision.

The board concluded that it was unnecessary for it to determine whether the contractor had established a differing site condition because the government, by providing "in the contract that the millings were to be hauled off base and were neither the property nor the responsibility of the Government," expressly "disclaimed responsibility for this material and thus [did] not bear the risk of the materials failing to conform to the specifications."  97-2 BCA ¶ 29,085.  It further explained:

> It was the contractor's responsibility to investigate and select sources of supply and prior to bidding obtain assurances that the materials needed to perform the contract work in accordance with the contract terms would be available.  Appellant made no efforts to determine prior to bidding that recycled materials from the runway, which were not Government-furnished property and for which the Government disclaimed responsibility, could be used to meet all the contract requirements.  Appellant knew or reasonably should have known of risks inherent in the use of [recycled asphalt].  Appellant should have recognized the uncertainties involved in using [recycled asphalt] from a source that it had not used on other projects.  The failure to appreciate a risk in using an untested source of materials for contract performance which led to appellant's increased costs of doing replacement work is not a failure for which the Government is held liable.

Id. (citations omitted).  The Federal Circuit agreed with the board's analysis.  It found that although there was "evidence supporting the proposition that the coal-tar-based joint sealant constituted an unknown and unusual physical condition at the site," that evidence was irrelevant because "the provisions of the contract . . . placed the risk that milled material from the runway would not be suitable for use as [recycled asphalt] on the contractor."  173 F.3d at 433.  It

therefore concluded that "[t]o the extent that [the contractor] could not be certain" that the milled material was suitable for reuse, "it proceeded at its own risk when it used the material." Id.

The situation presented in Martin Paving Co. is distinguishable from the facts of this case. In general, breach of contract cases are factually unique; their resolution depends on, among other things, the terms of the contract at issue. The paving contract in Martin Paving Co. differs from the construction contract in this case in at least one critical aspect: in Martin Paving Co., the government expressly disclaimed ownership of, and responsibility for, the milled material, while in this case, there was no such disclaimer. In fact, the contract reflects the Corps' intent to retain ownership of and responsibility over the excavated material: (1) satisfactory excavated materials were to be used on the project site; (2) surplus satisfactory excavated materials could not be disposed of without the Corps' written authorization; and (3) the Corps could direct the placement of any material it designated as clean fill anywhere on Fort Lewis. Moreover, the contracting officer, Ms. Gary, admitted during her deposition that she was not aware of any facts that would lead her to conclude that plaintiff should have been aware of the lead contamination in the soil prior to contract award. Ms. Gary would not have made such an admission if the contract had placed the onus on plaintiff to ascertain whether the excavated material was contaminated with lead. Because the contracts in the two cases differ substantially, the court declines to apply the reasoning in Martin Paving Co. to the facts of this case.

Addressing plaintiff's differing site condition argument head-on, defendant contends that plaintiff has not established that the lead contamination was an unknown physical condition, that there existed a material difference in conditions due to the lead contamination, or that any material difference caused an increase in plaintiff's cost or time of performance. Def.'s Mot. 23; Def.'s Resp. Pl.'s Proposed Findings Uncontroverted Fact ("Def.'s Resp.") ¶¶ 10-11. With respect to the first element of a Type II differing site condition, defendant contends that the issue of whether plaintiff should have been aware of the lead contamination when it prepared its bid is a question of law, not a question of fact. Def.'s Resp. ¶ 10. As noted above, an unknown physical condition is "one that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience if any, as a contractor in the area." Perini Corp., 381 F.2d at 410. Plaintiff has presented evidence that (1) the contract documents did not disclose the lead contamination, see, e.g., Berglund Decl. ¶¶ 10-11; Marston Ex. 7 at 15; Marston Ex. 8 at 7; (2) the site inspection did not reveal the lead contamination, see, e.g., Berglund Decl. ¶ 9; and (3) an estimator with seventeen years of experience in the Fort Lewis region who was working for a construction firm doing business in the region for more than forty-one years found lead contamination to be an unusual condition, see, e.g., id. ¶¶ 4-5, 27-29. Defendant has not provided any evidence, in the form of affidavits, deposition testimony, or otherwise, that contradicts plaintiff's position. See RCFC 56(c). Indeed, as Ms. Gary testified during her deposition, plaintiff was not responsible for the lead contamination, nor could plaintiff had known of the lead contamination. Marston Ex. 7 at 11. Accordingly, the court is foreclosed from finding any genuine issue of material fact with respect to the existence of an unknown physical condition; plaintiff has established this element of a Type II differing site condition.

Next, with respect to the third element of a Type II differing site condition, defendant argues that "the presence of lead paint chips in project soils had no impact whatsoever on plaintiff's obligation to dispose of project soils within the contract price on Fort Lewis, if directed to do so by the Government."  Def.'s Mot. 23; accord id. at 24 ("[T]he fact that the project soils at issue in this case contained lead paint chips does not mean that they differed materially from ordinarily encountered project soils that were completely free of contaminants."). However, it is apparent that defendant's position is premised on the authority granted to the Corps in section 01410 of the contract, id. at 23-24, which the court has already determined is immaterial to its analysis because the Corps was not operating under that section when it directed plaintiff to dispose of the surplus material at Landfill #2.  Consequently, to prevail on the third element, defendant must present evidence supporting its contention that the lead-contaminated soil was not materially different from the soil ordinarily encountered in such work.  Defendant has not done so; instead, it asserts only that the issue of material difference is a question of law, not a question of fact.  Def.'s Resp. ¶ 11.  On the other hand, plaintiff has supplied evidence that the disposal costs for uncontaminated material would have been $0, see, e.g., Berglund Decl. ¶ 25; Johnson Decl. ¶ 5; Johnson Ex.; Marston Ex. 12 at 5-6; App. 36, whereas the disposal costs for contaminated material were over $120,000, see, e.g., Marston Ex. 14 at 1-2; App. 36; Def.'s Ex. 1, and that it was not able to sell the surplus material as it reasonably anticipated at the time it submitted its bid due to the presence of lead contamination, see, e.g., Berglund Decl. ¶ 30.  Thus, the court finds no genuine issue of material fact that the lead-contaminated material was materially different from what is ordinarily encountered in such work.  Moreover, there is no dispute that but-for the discovery of lead contamination, plaintiff would have been able to dispose of the surplus material pursuant to section 02300–the relevant provision here–at no cost. Thus, plaintiff has established causation.

Overall, defendant has provided no evidence pursuant to RCFC 56(c) contradicting plaintiff's establishment of all of the elements of a Type II differing site condition.  Accordingly, the court grants summary judgment in plaintiff's favor on its differing site condition claim.

### I. Constructive Change

The second theory of recovery advanced by plaintiff is the doctrine of constructive change.  Plaintiff contends that when the government "has directed a contractor to perform work that was not required under the terms of the contract" or "has instructed the contractor to perform work in a manner more costly than it had reasonably anticipated, the Federal Courts have utilized the concept of 'constructive change' to support a contractor's right to recover additional compensation for the added cost of the changed work."  Pl.'s Mot. 10-11.

"A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government."  Int'l Data Prods. Corp. v. United States, 492 F.3d 1317, 1325 (Fed. Cir. 2007) (citing Miller Elevator Co. v. United States, 30 Fed. Cl. 662, 678 (1994)); accord Ets-Hokin Corp. v. United States, 420 F.2d 716, 720 (Ct. Cl. 1970).  "A constructive change entails two

base components, the change component and the order or fault component. . . . The 'change' component describes work outside of the scope of the contract, while the 'order/fault' component describes the reason that the contractor performed the work." Miller Elevator Co., 30 Fed. Cl. at 678.

In the instant case, plaintiff was not required to perform work beyond the requirements of the contract. Rather, the Corps initially directed plaintiff to dispose of the surplus material off of Fort Lewis–a task entirely within the scope of section 02300. The later directive by the Corps to dispose of the material at Landfill #2 constituted a change to the terms of the contract only in the sense that it would lessen the costs of disposal. There is no dispute that but for the Corps' directive to dispose of the material at Landfill #2, plaintiff would have incurred greater disposal costs due to the lead contamination in the material. See Marston Ex. 8 at 9 (indicating Mr. Packard's opinion that disposal on Fort Lewis would cost "substantially" less than disposal off of Fort Lewis); App. 30 (noting, in the "Stockpile Characterization Report," that disposal of the material on Fort Lewis would reduce transportation and disposal costs), 37 (indicating, in a letter from Mr. Lewis, that disposal on Fort Lewis would mitigate costs). Regardless of cost, however, plaintiff was required to dispose of the material off of Fort Lewis. Accordingly, because plaintiff seeks reimbursement for the additional costs of disposal but does not challenge the fact that the contract required it to dispose of the excavated material in the first instance, plaintiff's allegations are properly considered under the Differing Site Conditions clause and not as a constructive change. The court therefore grants summary judgment in defendant's favor on plaintiff's constructive change claim.

## IV.  CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART AND DENIES IN PART** plaintiff's original and renewed motions for summary judgment and **GRANTS IN PART AND DENIES IN PART** defendant's original and renewed motions for summary judgment. The court has determined that defendant is liable for plaintiff's costs of disposal of the surplus material at Landfill #2. By **no later than Tuesday, April 9, 2013**, the parties shall file a joint status report suggesting a schedule for future proceedings on damages.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney

MARGARET M. SWEENEY

Judge
